*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WILLIAM EAGLE and BARBARA EAGLE,

       Plaintiffs-Appellees,

v

MACOMB INTERMEDIATE SCHOOL DISTRICT,

       Defendant-Appellant,

and

DEVELL ANTUAN PATMON,

       Defendant.

UNPUBLISHED
September 2, 2021

No. 354183
Macomb Circuit Court
LC No. 2019-002757-NI

Before: SAWYER, P.J., and BOONSTRA and RICK, JJ.

PER CURIAM.

Defendant, Macomb Intermediate School District (MISD), appeals as of right the trial court's order denying, in part, its motion for summary disposition under MCR 2.116(C)(7) on the basis of MISD's entitlement to governmental immunity. For the reasons discussed herein, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

This case arises from the collision of an MISD school bus and a vehicle driven by plaintiff, William Eagle. Plaintiffs[1]—Eagle and his wife Barbara—allege that Eagle suffered a brain injury and a left shoulder injury as a result of this collision. Defendants, MISD and Devell Antuan Patmon (the bus driver),[2] argued that he did not. This factual dispute forms the general basis for this appeal.

---

[1] We will use "plaintiffs" when referring collectively to Eagle and his wife.

[2] Patmon does not participate in this appeal. Still, when discussing events that occurred in the trial court, we will use "defendants" to refer collectively to MISD and Patmon.

Patmon was driving a school bus owned by MISD. Patmon was driving slightly in excess of the posted speed limit. Patmon "took a second to look away from the road [to change] the radio station," and so did not see the truck in front of him coming to a stop. Looking up and realizing that he was about to collide with the truck Patmon swerved to the left into the lane of oncoming traffic. Driving in that lane of oncoming traffic was Eagle. Patmon crashed into Eagle. Eagle may have "blacked out momentarily . . . because the next thing [he] remember[ed] [was] blood coming down blocking [his] vision." Eagle testified that his left shoulder was in "significant pain" immediately after the accident.

Police, emergency medical services (EMS), and the fire department arrived on scene. EMS observed that Eagle had a three-inch laceration on his forehead, and minor cuts and lacerations to his left arm. David Waller, one of the responding paramedics who assessed Eagle at the scene, testified that Eagle appeared "alert and oriented" and that paramedics had no reason to believe that Eagle had suffered an intracranial injury. EMS shuttled Eagle to Mount Clemens Regional Medical Center, where Eagle received a CT scan of his left shoulder. After reviewing the CT scan, doctors determined that there was "[n]o fracture or dislocation evidence[,]" but that there was a "decrease of the acromiohumeral space suggestive of a chronic rotator cuff injury." They also observed "[d]egenerative changes . . . at the acromioclavicular joint." Eagle also received a CT scan of his head and spine, which revealed no abnormalities. A doctor sutured the laceration on Eagle's forehead, and Eagle was discharged the next day.

About a week later Eagle went to see his primary care physician, Dr. Richard C. Weiermiller. Eagle complained of pain in his left shoulder. According to Eagle, he never had issues with his left shoulder before the accident. Examining Eagle, Dr. Weiermiller noted that "[p]ain limited range of motion of [Eagle's] left shoulder and even with passive range of motion [he] was not able to get [Eagle's] arm to extend above shoulder height." Dr. Weiermiller concluded that Eagle should seek the opinion of an orthopedic surgeon.

Eagle visited Dr. Charles C. Stroud, an orthopedic surgeon. Dr. Stroud took X-rays of Eagle's left shoulder and opined that Eagle had a "[p]robable large left shoulder rotator cuff tear[,]" noting that "[t]his probably is an acute on chronic situation." Dr. Stroud told Eagle that he had damage to his rotator cuff and gave Eagle treatment options. Eagle elected to try physical therapy.

A couple months later, Eagle returned to Dr. Stroud to have an MRI of his left shoulder. The MRI confirmed that Eagle had a rotator cuff tear in his left shoulder. Because physical therapy did not seem to be helping Eagle, Dr. Stroud recommended that Eagle undergo a "[l]eft reverse shoulder arthroplasty." Eagle underwent this procedure, which Eagle indicated "somewhat" improved the range of motion in his shoulder.

Dr. Parmod Mukhi, whom Eagle was seeing for concerns about his physical pain, conducted a physiatric evaluation of Eagle. On the basis of the data he collected and Eagle's medical records, Dr. Mukhi opined that Eagle's left rotator cuff tear arose out of the car accident. Dr. Mukhi also opined that this injury impaired Eagle's ability to play golf, to reach over his head with his left arm, and his ability to engage in activities that involve pushing and pulling with his left arm and shoulder.

Concerned about Eagle reportedly having memory issues, Dr. Mukhi referred Eagle to Dr. Nida H. Hamid, Psy.D., for a neuropsychological evaluation. Dr. Hamid evaluated Eagle six times over the course of a month. She diagnosed Eagle with a "[m]ild neurocognitive disorder," which she attributed to a "combination of aging affects[,] . . . [his] medical history of concussion at the time of his [car accident][,] [and] [his] cardiac and cerebro vascular history."

Defendants retained Dr. John F. O'Leary, Ph.D., to perform an independent neuropsychological evaluation of Eagle, and Dr. Matthew Sardelli, M.D. to perform an independent orthopedic evaluation of Eagle. Dr. O'Leary found no evidence that Eagle had suffered a brain injury as a result of the accident. Specifically, Dr. O'Leary found no "cognitive compromise associated with the residual effects of a concussion or traumatic brain injury[,]" and found that Eagle's memory functions were consistently within a normal range." After examining Eagle and reviewing Eagle's medical records, Dr. Sardelli opined that Eagle's rotator cuff injury had arisen before the collision. He also opined the accident did not aggravate that injury.

For noneconomic damages they alleged to have suffered as a result of the accident, plaintiffs sued defendants. Plaintiffs alleged that Patmon operated MISD's school bus in a grossly negligent manner under MCL 691.1407(2), and that MISD was liable under MCL 691.1504. Plaintiffs alleged the accident caused Eagle pain and suffering and caused Barbara to suffer a loss of consortium.

Defendants moved for summary disposition under MCR 2.116(C)(7), (8), and (10). First, citing MCL 691.1407(2)(c), defendants argued that Patmon was entitled to governmental immunity as to all claims against him because no reasonable juror could conclude that he had acted with gross negligence. Second, defendants argued that MISD was entitled to governmental immunity because the motor-vehicle exception, MCL 691.1405, applied to neither Eagle's claim that he suffered a brain injury, nor Barbara's claim for loss of consortium.[3] As to Barbara's loss of consortium claim, defendants argued MCL 691.1405 allowed recovery only for bodily injury and that loss of consortium was not a bodily injury. As to Eagle's claim of injury, defendants first argued that plaintiffs had provided no evidence that Eagle suffered from a brain injury. Eagle's medical records from after accident never mentioned Eagle having a brain injury, Dr. O'Leary had concluded that Eagle did not have a brain injury, and Eagle testified that no medical provider had ever diagnosed him with a brain injury. Second, in a reply brief, and despite not having addressed plaintiff's shoulder injury in their summary disposition motion, defendants seemingly conceded that Eagle had a left shoulder injury, but argued that this injury did not *result from* the accident. Citing Dr. Sardelli's report, and the fact that several of Eagle's medical records refer to Eagle's left shoulder injury as "degenerative," defendants argued that Eagle's injury arose before the accident. Finally, defendants also argued that plaintiffs had failed to satisfy the no-fault threshold under MCL 500.3135.

The trial court granted defendants' motion in part under MCR 2.116(C)(7), dismissing the claims against Patmon. The trial court concluded that Patmon was shielded by governmental immunity because he acted with only ordinary negligence. The trial court also dismissed the loss

---

[3] Defendants did not mention plaintiffs' claim about the injury to Eagle's left shoulder.

of consortium claim, agreeing with defendants that loss of consortium was not a bodily injury under the motor-vehicle exception to governmental immunity, MCL 691.1405. But the trial court denied summary disposition under MCR 2.116(C)(7) with regard to Eagle's claim against MISD. The trial court reasoned that plaintiffs had shown the motor-vehicle exception to governmental immunity was applicable to Eagle's claim because evidence had been presented from which reasonable minds could conclude that Patmon had operated the bus in an ordinarily negligent manner. The trial court did not address defendants' argument that plaintiffs had failed to show Eagle's alleged injuries resulted from the accident. Further, the trial court denied summary disposition, under MCR 2.116(C)(10), as to whether Eagle's injuries satisfied the no-fault threshold. The trial court found a genuine issue of fact existed concerning the nature and extent of Eagle's injuries and that this issue of fact was material to determining whether Eagle had suffered a serious impairment of bodily function. The trial court did not specify which of Eagle's injuries it was referring to, nor did the trial court explain why it believed there was an issue of fact as to the nature and extent of those injuries. The trial court simply summarized the record evidence and cited caselaw noting that summary disposition is inappropriate when a disputed issue of material fact turns on the credibility of deponent.

MISD now appeals as of right the trial court's holding that MISD was not entitled to governmental immunity under MCL 691.1407. On appeal, MISD argues that plaintiffs failed to show that Eagle's injuries resulted from the accident and, therefore, the trial court erred by denying summary disposition under MCR 2.116(C)(7).

"This Court reviews de novo a trial court's decision on a motion for summary disposition." *Allen v Bloomfield Hills Sch Dist*, 281 Mich App 49, 52; 760 NW2d 811 (2008). This Court also reviews de novo whether governmental immunity shields a defendant from tort liability. *Bennett v Detroit Police Chief (Amended Opinion)*, 274 Mich App 307, 310-311; 732 NW2d 164 (2006). Likewise, this Court reviews questions of statutory interpretation de novo. *McCahan v Brennan*, 492 Mich 730, 735-736; 822 NW2d 747 (2012). When reviewing de novo, this Court reviews the issue presented independently, without any required deference to the trial court. *Millar v Constr Code Auth*, 501 Mich 233, 237; 912 NW2d 521 (2018). "When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them." *Dextrom v Wexford Co*, 287 Mich App 406, 428; 789 NW2d 211 (2010). If the parties have submitted any affidavits, depositions, admissions, or other documentary evidence, a court must consult them in determining whether there is a genuine issue of material fact. *Id*. at 429. "If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court. However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate." *Id*.

Under the governmental tort liability act (GTLA), MCL 691.1401 *et seq*., when a government agency "is engaged in the exercise or discharge of a governmental function," that government agency is generally immune from tort liability. *Dextrom*, 287 Mich App at 416, quoting MCL 691.1407(1). "This would include a public school district's operation of a bus system." *Allen*, 281 Mich App at 53. "But the broad immunity afforded by the statute is limited by several narrowly drawn exceptions." *Id*., citing *Jackson v Detroit*, 449 Mich 420, 427; 537 NW2d 151 (1995). The exception at issue here is the motor-vehicle exception, MCL 691.1405, which provides that "[g]overnmental agencies shall be liable for bodily injury and property damage

*resulting from* the negligent operation by any officer, agent, or employee of the governmental agency of a motor vehicle of which the governmental agency is owner . . . ." MCL 691.1405 (emphasis added); *Allen*, 281 Mich App at 53.

Neither party on appeal contests whether Patmon operated MISD's school bus negligently. Rather, MISD argues that plaintiffs failed to show that Eagle's alleged injuries resulted from Patmon's negligent operation of the school bus. See MCL 691.1405. Citing *Setta v Kondziolka*, unpublished opinion of the Court of Appeals, issued July 27, 2006 (Docket No. 267397), p 2, MISD argues that MCL 691.1405's "resulting from" requires a plaintiff to produce "direct and clear medical evidence" that any injury was "the complete result of the motor vehicle accident."[4] Hence, MISD implies that a plaintiff must rule out all other potential causes of a putative injury to satisfy the "resulting from" language under MCL 691.1405. On that basis, MISD argues plaintiffs have failed to show that Eagle's alleged injuries resulted from the collision. MISD contends plaintiffs provided no proof that Eagle ever suffered from a brain injury. And to the extent plaintiffs showed that Eagle suffered from a left shoulder injury, MISD argues uncontradicted medical evidence shows that this injury was a degenerative condition that existed before the accident.

To begin, we disagree with MISD's suggestion that a plaintiff must rule out all other potential causes of a putative injury to satisfy the "resulting from" language under MCL 691.1405. MISD misconstrues this Court's holding in *Setta*, unpub op at 3. In that case, the plaintiff offered zero evidence that her injuries resulted from the car accident at issue. *Id*. at 3. For that reason, this Court noted that it "need not scrutinize the term 'resulting from,' but must simply apply the clear language of the statute . . . ." *Id*. Because the plaintiff in that case offered no evidence that her injuries resulted from the car accident, it went without saying that her injuries did not result from the car accident under MCL 691.1405.

Also, although this Court held in *Curtis v Flint*, 253 Mich App 555, 560; 655 NW2d 791 (2002), that the phrase "resulting from," as used in MCL 691.1405, "requires a more direct causal connection than the proximate cause 'but for' analysis[,]" this does not imply that a plaintiff must rule out other potential causes of a putative injury. In *Curtis*, an emergency vehicle was approaching a red light at an intersection. *Id*. at 557. A car driving in front of the plaintiff moved over to the curb lane and stopped to let the emergency vehicle through. *Id*. The plaintiff rear-ended the car parked in the curb lane and was injured. *Id*. The plaintiff argued that the emergency vehicle was negligent in approaching and entering the intersection and that, but for this negligence, the plaintiff would not have rear-ended the car in front of him. *Id*. at 558. This Court rejected plaintiff's argument, holding that the plaintiff failed to show that his injuries resulted from the negligent operation of the emergency vehicle. *Id*. at 562. Reasoning the phrase "resulting from" as used in MCL 691.1405" required a more direct causal connection than but-for causation, this Court explained that a plaintiff would have to show either "physical contact" between his vehicle and the government-owned vehicle or that "the government-owned vehicle physically forced the

---

[4] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017).

plaintiff's vehicle off the road or into another vehicle or object." *Id*. at 561. Nowhere in that opinion did this Court suggest that a plaintiff must establish beyond doubt that the collision caused his or her injuries.

That said, we disagree with MISD's argument that plaintiffs failed to offer evidence that Eagle's left shoulder injury—namely his torn rotator cuff—was a direct result of the collision. Unlike in *Curtis*, the government-owned vehicle in this case—the school bus—made physical contact with Eagle's car. And plaintiffs offered evidence that Eagle's left shoulder injury arose only as a result of this physical contact. In his deposition, Eagle testified that, immediately after the collision, he felt pain in his left shoulder, and that he never had issues with his left shoulder before the collision. More importantly, plaintiffs provided medical evidence to corroborate Eagle's testimony: Dr. Mukhi attested that he treated Eagle for pain after the accident and believed Eagle's rotator cuff tear resulted from the accident.

Of course, defendants did offer evidence contradicting Dr. Mukhi and Eagle. Dr. Sardelli, who performed an independent examination of Eagle, opined that Eagle's rotator cuff injury arose before the accident and there was no indication the collision aggravated this preexisting injury. Also, in his treatment notes, Dr. Stroud referred to Eagle's injury as "degenerative." Nevertheless, this did not entitle MISD to summary disposition. Because this evidence conflicts with plaintiffs' evidence, and there is no way to reconcile this conflict without weighing witness credibility, a genuine issue of material fact exists, precluding summary disposition.

On the other hand, we agree with MISD in regard to Eagle's putative brain injury: the record does not leave open a genuine issue of material fact as to whether Eagle suffered a brain injury as a result of the collision. Although Eagle received a three-inch laceration across his forehead as a result of the collision, he testified that he didn't "want to use the word unconscious, but I don't know if I blacked out for a second, few seconds or whatever, but I sure saw a lot of stars." Moreover, according to the medical record generated at the Mt. Clemens Regional Medical Center, Eagle "denies any loss of consciousness." EMS reported that Eagle appeared "alert and oriented" after the accident, and Waller testified that nothing he observed indicated that Eagle might have suffered an intracranial injury. At the same time, Eagle testified that no medical provider had ever told him that he had a brain injury, and Eagle's medical records from the emergency room corroborate this testimony. Eagle's medical records do not indicate any kind of brain injury. Indeed, the CT scan of Eagle's head and spine revealed no abnormalities. Equally important, after reviewing Eagle's medical records and performing an independent neuropsychological evaluation on Eagle, Dr. O'Leary concluded that he could discern "no indication of residual cognitive compromise associated with the residual effects of a concussion or traumatic brain injury."

Plaintiffs offered only one piece of evidence to contradict the foregoing: Dr. Hamid's neuropsychological evaluation. Dr. Hamid diagnosed Eagle with a "[m]ild neurocognitive disorder," which she, in part, attributed to Eagle's "medical history of concussion at the time of his [car accident] . . . ." This report, however, does not establish a question of fact, for Dr. Hamid had no factual basis to conclude that Eagle suffered a concussion from the collision. See *Mullholland v DEC Int'l Corp*, 432 Mich 395, 414; 443 NW2d 340 (1989) (noting that an expert must have an evidentiary basis for his or her own conclusions for those conclusions to be admissible); *Snead v John Carlo, Inc*, 294 Mich App 343, 354; 813 NW2d 294 (2011) ("The

-6-

moving party [under MCR 2.116(C)(7)] may submit affidavits, depositions, admissions, or other documentary evidence in support of the motion if substantively admissible.") (citation omitted). In her report, Dr. Hamid indicates she concluded Eagle suffered from a mild neurocognitive disorder by "taking into account [the] medical history of concussion at the time of the MVA[.]" But as noted, nowhere do Eagle's medical records suggest that Eagle suffered a concussion as a result of the accident.[5] For that reason, Dr. Hamid's factual basis for her conclusion is unclear and does not create a genuine issue of material fact.[6] Therefore, the trial court should have granted summary disposition in favor of MISD on plaintiff's claim relating to his alleged brain injury.

Nonetheless, and although the trial court never addressed whether Eagle's left shoulder injury resulted from the collision under MCL 691.1405, there was a genuine issue of material fact on that issue. "[I]f the parties present evidence that establishes a question of fact concerning whether the defendant is entitled to immunity as a matter of law, summary disposition [under MCR 2.116(C)(7)] is inappropriate[,]" and the trial court may not decide the issue as a matter law. *Kincaid v Cardwell*, 300 Mich App 513, 523; 834 NW2d 122 (2013). Accordingly, the trial court appropriately denied summary disposition with respect to plaintiff's claim relating to his alleged shoulder injury (even assuming that the issue was properly raised in defendants' summary disposition motion), and properly allowed the fact-finder to resolve that issue at trial. See *Kincaid*, 300 Mich App at 523. Therefore, with respect to that issue, the trial court reached the correct result, although for the incorrect reason.[7]

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. No costs.

/s/ David H. Sawyer
/s/ Mark T. Boonstra
/s/ Michelle M. Rick

---

[5] Accordingly, to the extent that the trial court found that plaintiffs had shown that Eagle suffered a brain injury as a result of the accident, it erred.

[6] The trial court apparently acknowledged this, as in its written opinion it noted that "[Eagle's] medical records do not substantiate that [Eagle] suffered a concussion at the time of the accident."

[7] "A trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason." *Gleason v Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003).